# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 98 C 5057 | DATE | 3/16/2001 |
| CASE TITLE | Home Builder Association of Greater vs. U.S. Corps of Engineers, et al | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion to dismiss third amended complaint (Doc. 31-1) granted. Plaintiff has leave to file an amended complaint, if it can do so consistent with Rule 11, on or before April 6, 2001.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 3 number of notices | Document Number |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | MAR 19 date docketed | |
| | Notified counsel by telephone. | | 35 |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | 3/16/2001 date mailed notice | |
| | Copy to judge/magistrate judge. | | |
| ETV | courtroom deputy's initials | FILED FOR DOCKETING 01 MAR 16 PM 5: 19 | ETV mailing deputy initials |
| | | Date/time received in central Clerk's Office | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HOME BUILDERS ASSOCIATION OF )
GREATER CHICAGO, )
)
)
Plaintiff, )
)
)
v. ) No. 98 C 5057
)
) Judge Rebecca R. Pallmeyer
U.S. ARMY CORPS OF ENGINEERS, )
CHICAGO DISTRICT; LT. COL. )
ROGER A. GERBER, FORMER )
DISTRICT ENGINEER, CHICAGO )
DISTRICT, U.S. ARMY CORPS OF )
ENGINEERS, AND LT. COL. PETER )
ROWAN, CURRENT DISTRICT, )
ENGINEER, CHICAGO DISTRICT, ) DOCKETED
U.S. ARMY CORPS OF ENGINEERS, )
) MAR 1 9 2001
Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Home Builders Association of Greater Chicago ("Plaintiff" or "Association") brought this action against the United States Army Corps of Engineers ("Corps") and certain Corps officials (collectively "Defendants") to challenge an Interagency Coordination Agreement ("ICA") executed by Defendants and other federal, state and local agencies. The ICA was designed to coordinate various programs that regulate soil erosion and sediment control in Lake County, Illinois. Plaintiff claims that the terms of the agreement exceed the Corps' statutory and regulatory authority. Defendants now move to dismiss Plaintiff's Third Amended Complaint, arguing that the ICA does not constitute "final agency action"

1

35

reviewable under the Administrative Procedure Act ("APA") and that Plaintiff does not have standing to bring this action. The court concludes that at least part of the ICA may constitute final agency action. As explained below, however, because Plaintiff does not currently suffer any injury that would be redressed by this lawsuit, Defendant's motion is granted.

## FACTUAL BACKGROUND

Plaintiff is a trade association with approximately 1,100 voluntary members consisting of "mostly residential developers and construction companies in eight counties in the Greater Chicago Area, including Lake County." (Third Amended Complaint (hereinafter "Complaint") ¶ 19.) The Association's primary purpose is "the protection and enhancement of its constituents' industry -- development of residential communities and housing construction." (*Id.* ¶ 20.) To this end, the Association strives to be the "voice of the housing industry throughout the greater Chicagoland area [and] to be pro-active in identifying and assisting the resolution of building industry issues on all governmental levels." (*Id.*)

Defendants, among other things, are responsible for issuing permits for the discharge of dredged or fill material into navigable waters at specified disposal sites pursuant to Section 404(a) of the Clean Water Act, 33 U.S.C. §1344. (*Id.* ¶¶ 3, 7.) In Illinois, the standards that a Section 404 permittee must meet for erosion and siltation controls are established and enforced by the Illinois Environmental Protection Agency ("IEPA"). (*Id.* ¶ 4.)

In January 1998, Defendants executed an Interagency Coordination Agreement ("ICA") with the Lake County Stormwater Management Commission ("SMC"), the Lake

2

County Soil and Water Conservation District ("SWCD"), and the United States Department of Agriculture Natural Resources Conservation Service ("NRCS"). (*Id.* ¶ 1; *see also* Complaint, Exhibit 1.) The signatory agencies are involved in various ways with regulating soil erosion in Lake County. SMC ensures that developments meet performance standards for implementing soil erosion and sediment control plans for development sites. (*Id.* ¶ 24; Exhibit 1.) SWCD is responsible for the development and implementation of a soil erosion and sediment control program. (*Id.* ¶ 25; Exhibit 1.) NRCS is responsible for a national program of conserving and developing land and water resources, with the primary objectives of reducing soil erosion to acceptable limits. (*Id.* ¶ 26; Exhibit 1.)

The stated purpose of the 1998 ICA was to "increase cooperation and coordination between" each of these signatory agencies and to "address soil erosion and sediment control provisions" contained in various permits. (Complaint, Exhibit 1.) The Corps' obligations under the ICA, in relevant part, are as follows:

> (1) Wherever appropriate, as a special condition of a Department of Army authorization, require the permittee to consult with the []SMC on soil erosion and sediment control plans.
>
> (2) At the Corps discretion, . . . require the permittee to submit a soil erosion and sediment control plan to the []SMC for review and approval . . . [and] utilize the plan review comments to determine the adequacy of the applicant's soil erosion and sediment control plan . . .
>
> (3) At the Corps discretion, as a condition of the Department of the Army permit, . . . require the permittee to schedule a preconstruction meeting with the []SMC . . .
>
> (4) If the Corps, NRCS, or []SWCD receives a report of a soil erosion and sediment control issue on a site, the agencies will contact []SMC. []SMC will

3

investigate . . . and [prescribe necessary corrective action]. If the []SMC fails to resolve a violation on an authorized permit site in a timely manner or if []SMC requests the Corps assistance, the Corps will take appropriate action.

(5) Request that []SMC conduct on-site inspections during the active construction phase(s) of land development projects to determine whether site development is in compliance with the approved plan and Corps permit requirements . . . and determine adjustments needed to the approved plan.

*Id.*

Plaintiff brought this action alleging that the ICA impermissibly extends the statutory and regulatory authority of the Corps and that the ICA was adopted without sufficient notice and comment. (*See* Complaint ¶¶ 5-9, 12.) Plaintiff further alleged that most of its members "do business or carry out activities that are subject to the ICA." (*Id.* ¶ 19.) According to Plaintiff, the ICA adversely affects those members by obligating them to: (1) prepare soil erosion and sediment control plans for SMC review; (2) modify those plans at SMC's demand; (3) implement those plans during construction; (4) submit to site inspections by SMC or the Chicago District; and (5) further modify the implementation of those plans at the Chicago District's and SMC's demand -- all of which increases "engineering and construction expenses." (*Id.* ¶ 21.) Plaintiff contends that its members must either defy the Corps and face enforcement for filling wetlands without an effective authorization or must submit to the ICA provisions. (*Id.* ¶ 21.)

Plaintiff filed its original complaint August 14, 1998, seeking injunctive and declaratory relief. (Doc. No. 1.) On June 17, 1999, this court granted Defendants' motion to dismiss Plaintiff's First Amended Complaint on standing and ripeness grounds, explaining that the ICA's "non-mandatory language" made it unclear under what circumstances Plaintiff

4

would face any adverse actions and that there was "little indication at all of the harm suffered by Plaintiff's members." *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Eng'rs*, No. 98 C 5057, slip op. at 9 (June 15, 1999).

On September 22, 1999, Plaintiff attempted to cure the defects in the original complaint by filing a second amended complaint with two attached letters, dated July 15, 1998 and November 30, 1998, issued by the Corps to entities identified by Plaintiff as "Lake County homebuilders." (Doc. No. 19; *see also* Doc. No. 27 at 6.) In the redacted letters, the Corps authorized construction under existing nationwide permits, conditioned upon review by the SMC of each applicant's soil erosion and sediment control plans. (*Id.*)

Notably, the letters themselves made no mention of the ICA, and Plaintiff did not clearly allege in its complaint that either of the recipients of the letters is a member of Plaintiff's Association. Nevertheless, this court concluded that, viewed in the light most favorable to Plaintiff, the complaint adequately alleged that the ICA procedures in those two instances had caused start-of-construction delays of several months. (*Home Builders*, No. 98 C 5057)(May 16, 1990)(Doc. No. 26.) Plaintiff had alleged that the Corps had exercised its discretionary authority under the ICA (thereby making the claim ripe for review) and that Plaintiff had suffered an injury in fact (the costs of the delay). (*Id.*) The court then directed Plaintiff to file a Third Amended Complaint in order to "make specific reference" to the letters and to establish associational standing by pleading "that the interests [Plaintiff] seeks to protect are germane to the organization's purpose." *Id.* (citing *Wiggens v. Martin*, 150 F.3d 671, 675 (7th Cir. 1998)). Plaintiff filed this Third Amended Complaint on May 24, 2000.

In October and November 1999, before Plaintiff filed its Third Amended Complaint, the signatory agencies executed a revised ICA.[1] (*See* Defendants' Memorandum in Support of Motion To Dismiss Third Amended Complaint (hereinafter "Defs.' Memo"), Exhibit 1.) The new ICA sets forth the five obligations of the Corps in the same language as appears in the earlier version. The stated purpose of the agreement was altered slightly, however. (*Id.* at 1, 3.) Whereas the 1998 ICA stated that it was intended to address soil erosion and sediment control provisions contained within various nationwide permits, the 1999 ICA says that it is intended to address provisions contained within "Chicago District . . . Army Corps of Engineers . . . authorizations." (Complaint, Exhibit 1; Defs.' Memo, Exhibit 1.) This change was made in light of the Corps' rescission of 21 nationwide permits in the Chicago District. This includes the two nationwide permits (12 and 26) that were the subject of the letters relied on by Plaintiff in its Second and Third Amended Complaints.[2] The Chicago District issued a set of regional permits, in part to replace the locally-rescinded nationwide permits, which took effect on January 1, 2000. (*Id.* at 5.)

---

[1] There may also be a 2000 ICA that supersedes the 1999 ICA, but because both parties briefed this issue before November 2000, any 2000 agreement is not now before this court. The court will, therefore, assume that the provisions detailed in the 1999 ICA are the most recent ones.

[2] Though both of those permits have since been rescinded, this action should not have affected either letter holder's permit. As Plaintiff explains, the former Nationwide Permit 26 is still in effect in the Chicago District until 2002 for previously authorized projects. (Plaintiff's Response to Defendants' Motion to Dismiss Third Amended Complaint at 3-4.) In addition, Nationwide Permit 12 was modified and reissued and is effective in the Chicago District. (*Id.* at 4.)

## DISCUSSION

A.  **Standard of Review**

In deciding a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the court accepts the allegations in the complaint as true and views all well-pleaded facts and any reasonable inferences drawn from the facts in the light most favorable to the plaintiff. *See Shawnee Trail Conservancy v. U.S. Dept. of Agric.*, 222 F.3d 383, 385 (7th Cir. 2000); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). In addition, the court may look "beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Bastien v. AT&T Wireless Servs., Inc.* 205 F.3d 983, 990 (7th Cir. 2000).

As the party asserting federal jurisdiction, Plaintiff bears the burden of persuading the court that subject matter jurisdiction exists. *See NFLC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 237 (7th Cir. 1995). Defendants contend that Plaintiff cannot meet this burden both because the ICA does not constitute final agency action capable of being reviewed under the APA and because Plaintiff lacks standing. Plaintiff responds that Defendants' arguments are not properly raised on this motion to dismiss because "Defendants either raised, or could have raised all their arguments about standing, ripeness, and finality" before the court ruled on the motion to dismiss on the second amended complaint and, further, that this court has already recognized its subject matter jurisdiction over this matter. *See* Plaintiff's Response to Defendants' Motion to Dismiss Third Amended Complaint, at 7.

As an initial matter, the court notes that Plaintiff's response rests on both a mistake of law and a misreading of this court's prior minute order. It is well settled that lack of subject matter jurisdiction may be raised at any time before final judgment and cannot be waived by the parties. *See* FED. R. CIV. P. 12(h)(3); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999); *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 76-77 (1996)("whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action"). Because subject matter jurisdiction cannot be waived by either party, Plaintiff is incorrect to say that Defendants cannot raise finality issues at this time or that the court cannot reach this issue on a motion to dismiss. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998). This court can (and must) properly address Defendants' finality argument.[3]

Plaintiff is also incorrect in its assertion that this court has already decided Plaintiff has standing. Though the court found that Plaintiff had remedied the speculative nature of the injury alleged in its first complaint by attaching the two letters from the Corps, it did not address whether Plaintiff had met all of the requirements of standing. Specifically, it did not address whether that injury in fact would be redressible by this suit. In addition, in its last opinion, the court directed Plaintiff to establish associational standing. This court will

---

[3] Notably, Defendants actually raised the issue of finality in each of their prior motions to dismiss. The court arguably must address the issue of finality as a threshold issue before any other jurisdictional questions, *see American Train Dispatchers Ass'n v. ICC*, 949 F.2d 413, 414 (D.C. Cir. 1991). In this case, however, because this court dismissed the prior amended complaints on grounds of standing and ripeness, it has not previously addressed the finality inquiry.

8

therefore entertain both of Defendants' arguments for dismissing the current complaint.

B.  Final Agency Action

The Administrative Procedure Act limits nonstatutory judicial review to final agency actions. 5 U.S.C. § 704; *see also Western Illinois Home Health Care, Inc. v. Herman*, 150 F.3d 659, 661-62 (7th Cir. 1998); *Abbs v. Sullivan*, 963 F.2d 918, 925-26 (7th Cir. 1992). As a general rule, the following conditions must be satisfied for agency action to be final:

> First, the action must mark the consummation of the agency's decision making process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)(citations omitted); *see also Whitman v. American Trucking Ass'n, Inc.*, 121 S.Ct. 903, 915 (2001)("Only if the [Agency] has rendered its last word on the matter in question . . . is its action final and thus reviewable.")

To determine whether an agency action is final, several significant facts include: (1) whether the action has the status of laws with penalties for noncompliance; (2) whether the impact on the aggrieved party is direct and immediate; and (3) whether immediate compliance is expected. *See Atchison, Topeka and Santa Fe Ry Co. v. Pena*, 44 F.3d 437, 441 (7th Cir. 1994); *Abbott Labs. v. Gardner*, 387 U.S. 136, 150-52 (1967); *see also Western Illinois Home Health Care*, 150 F.3d at 662. Courts deal with the "finality" element in a pragmatic way: the core question is simply "whether the agency has completed its decision making process, and whether the result of that process is one that will directly affect the parties." *Atchison*, 44 F.3d at 441 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). The principle that

9

courts may review agency action only when such action is final serves several interests: it allows an agency the opportunity to apply its expertise and correct its mistakes, avoids disrupting the agency's processes, and relieves the courts from having to engage in "piecemeal review which is at the least inefficient and . . . might prove to [be] unnecessary." *DRG Funding Corp. v. Secretary of Hous. and Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996).

Defendants contend that the ICA does not constitute final agency action because "the ICA does nothing more than describe a consultation process that may or may not be employed by the Corps in evaluating the adequacy of soil erosion and sediment control plans for projects requiring a Corps permit." Defs.' Memo at 8. As such, Defendants contend that the ICA merely sets up a broad discretionary program and that final agency action occurs only when, on a case by case basis, Defendant chooses to impose conditions on permit applicants as authorized by the ICA. To support its argument that broad discretionary programs cannot constitute final agency action, Defendant relies on *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 890-94 (1990).

In *Lujan*, the National Wildlife Federation challenged the "land withdrawal review program" of the Bureau of Land Management ("BLM"). *Id.* at 890. Under this "program" the BLM would determine the status of public land and its availability for private uses such as mining activities. *Id.* at 879. The Wildlife Federation averred that this reclassification of lands violated the Federal Land Policy and Management Act of 1976 ("FLPMA"). *Id.* In holding that the program did not constitute final agency action, the Supreme Court first explained that the program did not "refer to a single BLM order or regulation, or even to a

completed universe of particular BLM orders and regulations" but, instead, was "simply the name by which petitioners have occasionally referred to the continuing operations of the BLM." *Id.* at 890. As such, the Court found that the program was not an "identifiable agency action," and so it could not constitute "final agency action." *Id.* at 890. Without final agency action, the Court held that Plaintiff could not "seek wholesale improvement of this program by court decree" but, instead, must "direct its attack against some particular 'agency action' that caused it harm." *Id.* at 890-91.

Certainly, the ICA appears in some respects similar to the broad program challenged in *Lujan*. Notably, however, whereas the "program" in *Lujan* did not determine any action on its own, the ICA contains at least some mandatory language from which legal obligations flow. As described above, under the ICA, the Corps has agreed to five different provisions. *See supra* Section I, at 3 (listing the five provisions); *see also* Complaint, Exhibit 1. The first three of these permit the Corps to impose certain requirements on a permittee "[a]t the Corps' discretion" or "[w]herever appropriate." With respect to these three provisions, the court agrees with Defendants that they are completely discretionary and merely "describe a consultation process that may or may not be employed by the Corps" on a case by case basis.[4] If, under the ICA, the Corps had agreed to only these three provisions, the agreement would

---

4   The fact that the Corps has, in fact, employed these three provisions in the past (as witnessed by the two permittees whose permits were conditioned on local agency approval) does not make it more or less likely that the Corps will choose to employ those provisions again in the future. Instead, it only shows that the Corps is, in fact, engaging in consultation with SMC as contemplated by the ICA.

11

not constitute final agency action because, as with the BLM's program in *Lujan*, the final agency action would occur only if and when the Corps chose to utilize one of the three provisions. In addition, such an action would only be final as to the particular permittee, not all potential permittees, because that permittee would be the only person whose legal rights and obligations would flow from that particular agency action. Thus, the first three provisions on their own do not constitute final agency action.

The last two provisions (number 4 and 5), however, do not have the same discretionary language as the first three. Under the fourth provision, if the Corps or one of the other signatory agencies receives a report of a soil erosion and sediment control issue on a site, the agencies must contact SMC to investigate the report. Exhibit 1, Complaint at IV.A.4. Should the SMC fail to resolve a violation of a permit or if it requests the Corps' assistance, "the Corps will take appropriate action." *Id.* This reference to "appropriate action" leaves the Corps room to determine what action to take, but at least obligates the Corps to report violations to the SMC and to assist the SMC in resolving the issue. *Id.* at IV.A.4. In addition, under the fifth obligation, the Corps agreed to "[r]equest that []SMC conduct on-site inspections during the active construction phase(s) of land development projects" to ascertain that the site development is in compliance with the approved plan and Corps permit requirements and, if it is not, to determine any necessary adjustments to the plan. *Id.* at IV.A.5. These provisions of the ICA arguably go beyond merely establishing a consultation process that may be employed by the Corps: they require the Corps to refer compliance issues to SMC and work with SMC in resolving them --- conduct that, in

12

Plaintiff's view, exceed the Corps' authority.

Defendants argue, however, that even without the ICA, the Corps' existing regulations provide Corps districts with the authority to condition permit decisions on consultation with local agencies where appropriate. *See id* at 8, citing 33 U.S.C. §§ 1344(b)(1), 1344(e)(1) (describing Secretary of the Army's role in issuing permits for disposal sites); 40 C.F.R. Part 230 (describing purpose of guidelines for dredged or fill material); 33 C.F.R. § 325.1(b) (describing how district staff will be available to help with pre-application consultation and may involve other affected agencies in this process); 33 C.F.R. § 320.1(a)(5) ("The Corps uses general permits, joint processing procedures, interagency review, [and] coordination . . . to reduce duplication.").[5] Whether Defendants have the authority to do everything they agreed to do under the terms of the ICA, however, is irrelevant to the determination of whether the ICA constitutes final agency action.

Finally, Defendants contend that in any particular action taken under the ICA, applicants for a Corps permit remain free to seek available administrative appeals and judicial review of any permit decision. Defs.' Memo at 8. Defendants rely on *Abbs v. Sullivan*, 963

---

[5] This court agrees with Defendant that the Corps' regulations provide Corps districts with the authority to condition permit decisions on consultation with local agencies where appropriate. Plaintiff suggests, however, that the ICA exceeds that authority to the extent it permits the Corps to be an active participant in on-site inspections or to correct violations of an authorized permit as ICA sections IV.A.4 and 5 allow. In fact, the regulations cited by Defendants give no indication that the Corps may be involved in soil erosion and sediment control issues after a permit has been granted. Because the court later concludes that Plaintiff does not yet have standing to bring this suit, it expresses no opinion at this juncture on the issue of whether the Corps has in fact exceeded its authority by entering into the ICA.

13

F.2d 918, 927 (7th Cir. 1992), for the proposition that there is no final agency action "when the only harm the challenger seeks to avert is the inconvenience of having to go through the administrative process before obtaining a definitive declaration of his legal rights." 963 F.2d 918, 927 (7th Cir. 1992).

The court agrees that certain provisions of the ICA may only require Plaintiff's members to go through an administrative process before obtaining a definitive declaration of their legal rights. For example, if the Corps conditions a permit on approval by the SMC and an applicant does not get that approval, the applicant could seek administrative review of that decision because, as Defendant has explained, the Corps has promulgated procedures that allow for permit applicants to appeal any adverse decision relating to their permit. *See, e.g.* 33 C.F.R. § 331.1 (establishing the procedures for permit applicants to appeal Corps' decisions with which they disagree).

Under other provisions of the ICA, however, it is not as clear that Plaintiff need only go through administrative review channels to receive a declaration of their rights. For example, if the Corps requested that SMC conduct on-site inspections during the active construction phase (which it must under the ICA) and this inspection results in construction delays or imposes on the permittee the costs of proving to the SMC that construction was in compliance with the Corps permit, it is not clear how the permittee could obtain relief from costly or unfair on-site inspections through administrative channels. Defendants do not point to any established procedures for allowing permittees to appeal on-site inspections. Nor is it clear whether SMC has such procedures. Furthermore, even if SMC does have such

14

procedures, if it is the Corps that mandates the SMC to conduct the on-site inspections, it is not clear how Plaintiff could get relief from expenses caused by any unnecessary on-site inspections merely by challenging the SMC's action. Thus, the ICA potentially does more than merely force Plaintiff's members to go through the administrative process to obtain a definitive declaration of their rights. It imposes certain legal obligations on them without clearly stating how they could challenge those obligations, other than by challenging the ICA.[6]

The court therefore concludes that at least provisions four and five of the Corps' obligations under the ICA do more than merely establish a consultation process that may or may not be invoked by the Corps. Because legal obligations flow from some of the provisions of the ICA (namely, Plaintiff's members will have to comply with the on-site inspections or risk losing their Corps' permit), these provisions of the ICA may be deemed final agency action.

C. Standing

As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing by "competent proof" the familiar constitutional requirements of standing: (1) injury in fact that is concrete and not merely speculative, (2) caused by Defendant, that is (3) redressible by

---

[6] It may be that the SMC is allowed to impose these on-site inspection costs and delays and that the ICA, by requiring the Corps to request that the SMC do the inspections, does not change the nature of these inspections. Because the boundaries of the SMC's power are not now before this court, however, the court will assume that it may not be allowed to impose these costs.

15

this action. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). In its May 16, 2000 order, this court determined that Plaintiff had adequately alleged a non-speculative injury. The court then ordered Plaintiff to show that it had associational standing.

Before reaching the issue of associational standing, the court must address Defendant's argument that Plaintiff has not yet established all of the required elements of standing. In an earlier opinion, this court held that Plaintiff had shown an injury in fact by attaching the two letters from the Corps to two applicants for nationwide permits, conditioning a permit on local agency approval. As has been explained, those letters showed injury in the form of construction delay costs. Defendant now argues, however, that those injuries are moot because the two nationwide permits involved have since been rescinded and, therefore, the ICA will not govern those permits anymore. Defendant argues further that even if those injuries were not moot, the injuries would not be redressed by enjoining the ICA because the applicants were successful in getting their permits and, therefore, do not currently face any construction delays.

To the extent that Defendant argues the injuries are moot because the 1999 ICA does not govern nationwide permits, the court disagrees. The new ICA establishes review procedures for all "Chicago District . . . Army Corps of Engineers . . . authorizations." (Def.'s Memo, Exhibit 1.) The new ICA therefore governs all current permits and should also cover any nationwide permits that, even though rescinded, are currently continuing as

16

regional permits.

The court does agree, however, that this action to enjoin the ICA will provide no relief for the two letter holders who have already suffered delays in construction. As Plaintiff admits, the Corps has since granted each of those letter holders a permit. *See* Doc. No. 19, Motion to File Second Amended Complaint for Declaratory and Injunctive Relief Instanter ¶ 7. Because those developers no longer face any construction delays, they have no injury that would be redressed by enjoining the ICA. Nor can Plaintiff fairly establish a threat of future construction delays sufficient for standing purposes. As has already been explained, the first three provisions of the Corps' obligations under the ICA allow it to condition a permit on local agency approval. These provisions are completely discretionary and will be employed in the future on a case by case basis if and when the Corps chooses to use them. These letters, therefore, cannot show a threat of imminent harm because conditioning a permit on local agency review remains completely within the discretion of the Corps. Notably, the letters themselves make no mention of the ICA. Thus, at most they merely demonstrate that a procedure described by the ICA is currently being employed, making this case arguably ripe for review, but do not show any real or threatened injury which would be redressed by enjoining the ICA.[7]

In order for Plaintiff to show that it is facing imminent harm by the ICA, therefore,

---

[7] In this court's prior opinion, it found that Plaintiff had alleged an injury in fact by pointing to the construction delays, but did not decide whether such injury could be redressed by this action and, therefore, did not decide whether Plaintiff had standing to sue (indeed, it instructed Plaintiff to plead that it had associational standing).

17

it must look to the non-discretionary provisions of the ICA (provisions 4 and 5) and show how those provisions are imposing tangible harm. Those provisions include the Corps agreement to contact SMC to investigate any reports of soil erosion or sediment control issues and to take appropriate action against the offender if SMC does not do so. The provisions also authorize the SMC to conduct on-site inspections during the active construction phase of land development and to determine any adjustments necessary. Even accepting Plaintiff's suggestion that these provisions allow the Corps to continue monitoring a site even after a permit has been granted and that, without the ICA, the Corps may not be allowed to so monitor a site, it still is not clear how this monitoring will injure Plaintiff's members.

Plaintiff answers that its members face "greatly increased engineering and construction expenses for," among other things, "submitting to site inspections by SMC or the Chicago District and further modifying [construction] plans at the Chicago District's and SMC's demand." But it is not at all clear why Plaintiff would face these increased costs, especially in light of the fact that even without the ICA, the SMC might well be subjecting Plaintiff's members to site inspections. *See* ICA (the purpose of the SMC is to "[ensure] that development[s] meet performance standards for implementing soil erosion and sediment control plans for development sites"). It is unclear why Plaintiff would face extra site inspection costs when the Corps becomes involved in the process. Until Plaintiff can explain in its complaint why its members would face these extra costs, or until it can show any ongoing or threatened injury occurring under the ICA, it has not alleged an injury in fact that

18

can be redressed by this suit and, therefore, it does not have standing to bring this action.

After three amended complaints, it remains unclear what concrete injury Plaintiff's members suffer under the ICA. Indeed, in the more than two years that the agreement has been employed, Plaintiff has yet to point to any more than two examples of past action affecting the 1,100 members of the Association. This motion to dismiss must, therefore, be granted.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted.

ENTER:

Dated: March 16, 2001

REBECCA R. PALLMEYER
United States District Judge